[No. G006409. Fourth Dist., Div. Three. Aug. 31, 1989.]

HUNTINGTON LANDMARK ADULT COMMUNITY
ASSOCIATION, Plaintiff and Respondent, v.
EDWARD ROSS et al., Defendants and Appellants.

COUNSEL

Nick O'Malley and James R. Goff for Defendants and Appellants.

Marvin D. Mayer for Plaintiff and Respondent.

OPINION

SCOVILLE, P. J.—Defendants Shermoen and Ross appeal from an order denying their motion for new trial and from a judgment against them on plaintiff Huntington Landmark Adult Community Association's (HLAC) suit for injunctive and declaratory relief seeking to enforce age restrictions in the association's covenants, conditions and restrictions (CC&R's) as amended in June 1986 to conform to Civil Code section 51 et seq.

FACTS

HLAC, a condominium project located in Huntington Beach, was built in the early 1970's. As originally written, the CC&R's pertaining to the project contained an age restriction which provided "No person shall be a resident of the Adult Community unless such person is at least forty (40) years old or is the spouse of a resident who is at least forty (40) years old." In the early 1980's the California Supreme Court decided *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115, 30

A.L.R.4th 1161]; and *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427], throwing into doubt the validity of age restrictions in residential condominium projects such as HLAC.

Defendant Lawrence Shermoen had purchased two units in HLAC, one for himself and his wife and another for his mother-in-law, Emma DeHaven. In June 1979, Shermoen allowed his 14-year-old grandson, Shane, to move in with Emma DeHaven.[1]

Defendant Edward Ross and his wife purchased a unit at HLAC in approximately October 1979. However, it was not until October 31, 1983, that the Rosses moved into the unit with Victoria, their 21-year-old daughter.

In 1984 the Legislature enacted Civil Code sections 51.2 and 51.3, effective January 1, 1985. Those sections enacted an exception to prohibitions against age discrimination in housing for accommodations "designed to meet the physical and social needs of senior citizens." (Civ. Code, § 51.2, subd. (a).) A senior citizen was defined as "a person 62 years of age or older, or 55 years of age or older in a senior citizen housing development." (Civ. Code, § 51.3, subd. (c)(l).) A senior citizen housing development was defined as "a residential development consisting of at least 150 dwelling units in a standard metropolitan statistical area or at least 35 dwelling units in any other area which is developed for, or substantially rehabilitated or renovated for, senior citizens." (Civ. Code, § 51.3, subd. (c)(3).) Civil Code section 51.3, subdivision (g), also provided: "The covenants, conditions and restrictions . . . applicable to any condominium . . . which contained age restrictions on January 1, 1984, shall be enforceable only to the extent permitted by this section, notwithstanding lower age restrictions contained in those documents or policies."

HLAC brought this suit to enforce its age restriction as modified by Civil Code section 51.3. The main issue was whether HLAC came within the definition of "senior citizen housing development," that is, whether it was developed for, or substantially rehabilitated or renovated for, senior citizens.

---

[1] We refer to Lawrence, his wife, Shane and Emma DeHaven collectively as the Shermoen defendants in this opinion. We also refer to Edward Ross, his wife, and Victoria, their 21-year-old daughter, collectively as the Ross defendants.

HLAC is a condominium development of 1,236 one-story units, including approximately 200 which are second-floor units accessible by outside stairs. There are 4 or 5 different floor plans and the size of the units is from 900 to 1100 square feet or 1132 to 1336 square feet. The project was developed as a gate-guarded community with 24-hour guard protection at the entrance and exit gates and a roving security guard provided during the evening hours to patrol the common areas. The speed limit for automobiles within the facility is 25 miles per hour, enforced by speed bumps in the streets, and bicycle activity is restricted.

The individual condominium units are connected by wider than normal sidewalks, set in greenbelts and grouped around a central recreational facility. The large, central facility is equipped with a pool, administrative offices, a wood shop, lapidary shop, ceramics area, art room, library, card room, pool room, photo lab, sewing room, workout room containing weights, etc., community meeting rooms, and a large central facility that is used for dinner parties and other functions. There is also a smaller community facility located in the northwest section of the development. The smaller facility contains a pool, spa, deck area for sun bathing, shower, rest rooms and a card room. The pool at the smaller facility is a uniform five feet in depth, and the pool at the larger facility is no shallower than five feet and no deeper than six feet. There are also four tennis courts located within the development.

Kirk Watilo was the general manager at HLAC from April 1984 to April 1986, during which time he had approximately 10 employees working under him including a full-time recreation director (who had one assistant and a part-time person), various maintenance employees and a secretarial staff. The recreation director provides a range of activities for the residents of HLAC. Classes take place on the premises that are conducted by Coastline Community College, and, according to Watilo, have included a pool exercise class, ceramics classes, art classes, card-playing classes, dancing classes, language classes, and singing classes. The recreation director also arranges dinner dances, parties on holidays and special occasions, and a "mixer" every other Friday night.

The HLAC Foundation sponsors special interest clubs that hold functions at the recreational facility, including bingo, bridge and cards, billiards, shuffleboard, tennis tournaments, besides the usual club activities. In addition, the residents of HLAC formed a neighborhood assistance program in September 1983, the purpose of which is to "watch out for the others who

were becoming frail, who needed some assistance in getting places, . . . in preparing food or going shopping and these kinds of things." The residents volunteer their time assisting residents and also provide wheelchairs, canes and walkers which are loaned out to residents who need them without charge. Residents also provide a blood pressure clinic on a regular basis.

During the two years that Watilo was general manager of HLAC, sidewalks at the development were cut for wheelchair ramps and stairs on the two-story buildings were painted with white stripes to make them more visible. In addition, handicapped parking zones were added at the clubhouses and the surfaces of the streets were replaced.

William Markas was employed as marketing director for Signal Landmark in connection with the development of HLAC in the early 1970's to June 1982. Prior to that he worked for Rossmoor Leisure World. HLAC was patterned on the facilities at Leisure World, and Markas was sought as a consultant to advise Signal Landmark developers on changes that would improve HLAC over Leisure World. Markas testified that the amenities at HLAC were copied from Leisure World, and the only difference between Leisure World and HLAC was that Leisure World was restricted to persons 52 years of age and older, while HLAC was restricted to persons 40 years of age and older. Markas testified that as marketing director of HLAC the market he was aiming to sell to was "older people."

Karen Adams, who has separate masters degrees in urban planning and gerontology, works for Gerontological Services, Incorporated, where she is involved in assessing and evaluating senior citizen projects. Adams met with the staff at HLAC, toured the facility, and reviewed architectural plans and brochures advertising the facility. In her opinion, the facility was designed for an older population, that is, people 55 years of age and older. She testified that HLAC was "very accommodating to an older and of particular importance . . . still aging population." She also testified that in her opinion a senior citizen project should not be totally handicapped designed. It is largely unnecessary for senior citizens in the 55-to-65 age range, and it is psychologically counterproductive to that age group, having a tendency to make them feel old and dependent. An older population, ranging from 55 to 90 and above, has a wide gamut of needs and demands which must be met; handicapped facilities are only one facet of those needs and demands.

## DISCUSSION

Based on this evidence the trial court held that HLAC qualified as a "senior citizen housing development" within the meaning of Civil Code section 51.3, that is, it was "developed for, or substantially rehabilitated or renovated for, senior citizens [persons 55 years of age or older]." (Civ. Code, § 51.3, subdivision (c)(3).) Defendants challenge this finding from every angle. ■ It must be remembered, however, that in assessing these claims we are bound by the rules of appellate review that constrain us to indulge every intendment in favor of the judgment and consider the evidence in the light most favorable to the prevailing party giving him the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

At the outset we note that during oral argument counsel for defendants Ross informed this court that Victoria Ross has married and moved out of the Ross condominium. Accordingly, the issues raised by the Ross defendants are moot except for their claim as to the propriety of the attorney's fees which we will discuss hereinafter.

I

■ Defendants complain the trial court's ruling is not supported by the evidence because HLAC was not designed primarily with the handicapped in mind. We disagree with the basic premise. The evidence, as well as common sense, supports the conclusion that housing designed for senior citizens should not be restricted to housing designed for the handicapped.

Civil Code section 51.3, subdivision (a), declares that senior citizens need "special living environments and services," and Civil Code section 51.2, subdivision (a), provides an exception to the prohibition against age discrimination for accommodations "designed to meet the physical and *social* needs of senior citizens." (Italics added.) The physical needs of senior citizens cannot be said to be restricted to handicapped care. However, evidence that the size of individual units at HLAC are small, one-story in height, and require no yard work suggest that they are designed with senior citizens in mind; that is, people who have raised their children, do not need extra space for extended family, and do not wish to expend hours in home and garden care necessitated by the traditional single-family residence. In addition, evidence that the units are grouped around extensive communal

recreational and educational facilities suggests a population with more time on its hands than the traditional family unit devoted to work outside and inside the home, child rearing and other domestic pursuits. In short, the evidence shows that HLAC was designed as an "active retirement community," a phrase borrowed from advertising brochures created for HLAC. We hold the evidence supports the trial court's determination such a facility is clearly within the definition of a senior citizen housing development as it is used in Civil Code section 51.3.[2]

## II

Defendants argue that Shane should have been "grandfathered" in under the last paragraph of Civil Code section 51.3, subdivision (g), which provides, "Any person who has the right to reside in, occupy, or use the housing or an unimproved lot subject to this section on January 1, 1985, shall not be deprived of the right to continue that residency, occupancy, or use as the result of the enactment of this section." On this issue the trial court determined that Shane did not have a right to residency in HLAC at the pertinent time because he was not over the age of 40, the age restriction contained in the original CC&R's.

Defendants contend that under *Wolfson* and *O'Connor* the 40-year-old age restriction contained in HLAC's CC&R's was invalid and hence when Civil Code sections 51.2 and 51.3 were enacted Shane had a right to live at HLAC. We disagree. Neither of the cited cases abrogated all age restrictions in housing. In *Wolfson* a large apartment complex had a blanket policy of refusing to rent apartments to families with children. In *O'Connor* the CC&R's for a condominium development contained a prohibition against residency by anyone under the age of 18. In those cases the court held that such blanket exclusions of children and families with children violated the provisions of the Unruh Act. (Civ. Code, § 51.) But neither case stands for the proposition that any age restriction is unlawful. In fact the court in *Wolfson* stated specifically, "In light of the public policy reflected by these legislative enactments, age qualifications as to a housing facility reserved for older citizens can operate as a reasonable and permissible means under the Unruh Act of establishing and preserving specialized facilities for those particularly in need of such services or environment.

---

[2] We note the court in *Bliler* v. *Covenant Control Com.* (1988) 205 Cal.App.3d 18 [252 Cal.Rptr. 50], at page 27, construed Civil Code section 51.3 "to include any preexisting residential development as a 'senior citizen housing development' regardless of the actual purpose for which it was originally designed or constructed as long as its physical characteristics meet the requirements of the statute."

[Citations.] Such a specialized institution designed to meet a social need differs fundamentally from the wholesale exclusion of children from an apartment complex otherwise open to the general public." (Fns. omitted.) (*Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d 721, 742-743.)

It is true that in *Park Redlands Covenant Control Committee* v. *Simon* (1986) 181 Cal.App.3d 87 [226 Cal.Rptr. 199], the court struck down a residency requirement in a housing development's CC&R's requiring residents to be 45 years of age or older. However, that case concerned a subdivision of small single family residences on smaller than usual lots which had no other indicia they were designed to meet the special needs of senior citizens. In that regard the court stated, "Furthermore, to bring age discrimination under the one exception to the Unruh Act as yet sanctioned by California courts, the discrimination must occur (1) to meet the special needs of senior citizens, and (2) it must take place in the context of housing designed especially for the elderly. [Citation.] The presence of neither of these factors has been demonstrated here." (*Id*. at p. 94.) *Park Redlands* is distinguishable from this case since we have held the evidence is sufficient to support the trial court's determination that HLAC was designed to meet the special needs of senior citizens.

### III

Defendants also point to the provisions of Civil Code section 51.3, subdivision (d): "The covenants, conditions, and restrictions or other documents or written policy shall not limit occupancy, residency, or use on the basis of age more proscriptively than to require that one person in residence in each dwelling unit may be required to be a senior citizen and that each other resident in the same dwelling unit may be required to be a qualified permanent resident." A qualified permanent resident is defined in Civil Code section 51.3, subdivision (c)(2) as ". . . a person who meets all of the following requirements: [¶] (A) Was residing with the qualifying resident or senior citizen prior to the death, hospitalization, or other prolonged absence of, or the dissolution of marriage with, the qualifying resident or senior citizen. [¶] (B) Was 45 years of age or older, or was a spouse, cohabitant, or person providing primary physical or economic support to the qualifying resident or senior citizen. [¶] (C) Has an ownership interest in or is in expectation of an ownership interest in, the dwelling unit within the housing development that limits occupancy, residency, or use on the basis of age."

Defendants contend Shane was a qualified permanent resident because he provided "primary physical support" to his great-grandmother, Emma

DeHaven. The trial court made a factual determination to the contrary, and we hold that factual determination is supported by substantial evidence. In any case, the provisions of Civil Code section 51.3 require that a person comply with all three requirements before he or she qualifies as a "qualified permanent resident" and is subject to exemption from the age requirements.

## IV

Defendants contend that enforcement of Civil Code section 51.3 denies Shane his constitutional right to familial privacy. That argument was put to rest in *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370, 388-390 [256 Cal.Rptr. 750, 769 P.2d 932].

## V

In their reply brief, defendants state "The board [of HLAC] did not even bother to provide hearings for those allegedly in violation of the CC&Rs though hearings are provided for under the rules." This issue was not pursued at trial nor on this appeal. ■ An appellate court is not required to consider alleged error where the appellant merely complains of it without pertinent argument. Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned. (*Estate of Randall* (1924) 194 Cal. 725, 728 [230 P. 445]; *Rossiter* v. *Benoit* (1979) 88 Cal.App.3d 706, 710 [152 Cal.Rptr. 65]; *Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].)

## VI

■ On this appeal defendants contend for the first time that the recent enactment of the Fair Housing Amendments Act of 1988 (Pub.L. No. 100-430 (Sept. 13, 1988) 102 Stat. 1619, 1988 U.S. Code Cong. & Admin. News, No. 8), effective March 1989, is applicable here, bans discrimination on the basis of familial status except for limited senior citizen housing which HLAC does not qualify for, and that we should remand this matter to the trial court so that it can make necessary factual determinations as to whether HLAC can discriminate against Shane under the new federal legislation.

Defendants rely on cases which hold when injunctive relief is sought under a statute which is changed after trial but before an appeal is heard, the appellate court should determine the right to injunctive relief in light of

the statutory changes. (See *White* v. *Davis* (1975) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222]; *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497]; *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 527-528 [45 P.2d 972]; *Bank of Idaho* v. *Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 11-12 [186 Cal.Rptr. 695].) Does the same rule apply when plaintiff seeks injunctive relief under a state law and while the matter is on appeal the federal government enacts a similar statute? We think not under the circumstances of this case. Defendants have failed to sustain their burden of demonstrating a different result would be obtained if the federal law were applied.

At the outset, defendants fail to make a showing the Federal Fair Housing Act is applicable to HLAC. (See 42 U.S.C. § 3603.) The federal act only purports to supercede state law to the extent they conflict. Thus 42 United States Code section 3615 provides, "Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this subchapter shall be effective, that grants, guarantees, or protects the same rights as are granted by this subchapter: but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."

The Fair Housing Amendments Act makes it unlawful for a business which engages in residential real estate-related transactions to discriminate on the basis of "familial status," as well as on the previously forbidden grounds of race, color, religion, sex, handicap, or national origin. (42 U.S.C. § 3605.) However, "familial status" is defined to mean families which include children under the age of 18. (42 U.S.C. § 3602(k).) Since none of the defendants are under the age of 18 this provision would appear to be inapplicable.

"While the new act generally bars discrimination in housing against families with children under 18, it also creates an exception for 'housing for older persons' in which discrimination on the basis of familial status is not prohibited. (42 U.S.C. § 3607(b)(1).)" (*Schmidt* v. *Superior Court, supra,* 48 Cal.3d at p. 575.) "Housing for older persons" is defined to include, inter alia, housing which is "intended and operated for occupancy by at least one person 55 years of age or older per unit" provided that such housing includes "significant facilities and services specifically designed to meet the physical or social needs of older persons" and meets other specified criteria. (42 U.S.C. § 3607(b)(2)(C).)

Defendants argue that HLAC does not provide significant facilities and services designed to meet the physical or social needs of older persons within the meaning of the federal act because it does not provide each and every service and facility outlined in Federal Rules and Regulations describing 55 or over housing. (See 54 Fed.Reg. 3290 (Jan. 23, 1989) § 100.304.) Section 100.304, subdivision (b)(1) provides in pertinent part, " 'Significant facilities and services specifically designed to meet the physical or social needs of older persons' include, but are not limited to, social and recreational programs, continuing education, information and counseling, recreational, homemaker, outside maintenance and referral services, an accessible physical environment, emergency and preventive health care of [*sic*] programs, congregate dining facilities, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them (*the housing facility need not have all of these features to qualify for the exemption under this subparagraph*)." (Italics added.)

Defendants also argue that the federal act was not designed to oust persons who were in housing designed for older persons prior to the effective date of the amendment. They refer to the provisions for 62 or over housing. Section 100.303, subdivision (a)(1) (54 Fed.Reg. 3290) provides, "The provisions regarding familial status in this part shall not apply to housing intended for, and solely occupied by, persons 62 years of age or older. Housing satisfies the requirements of this section even though: [¶] (1) There are persons residing in such housing on September 13, 1988 who are under 62 years of age, provided that all new occupants are persons 62 years of age or older; . . . ." This provision only allows housing to qualify for the exemption. It does not, however, forbid a condominium project from excluding persons who do not comply with valid age restrictions in the project's CC&R's.

## VII

■ The Ross defendants contend there is no provision for attorney's fees in the CC&R's. They are mistaken. The supplemental declaration of easements, covenants, conditions and restrictions provides HLAC has the power to commence and maintain actions and suits to restrain and enjoin breach of the CC&R's and HLAC shall be entitled to reimbursement for costs "including but not limited to reasonable attorney's fees" incurred in enforcement of said CC&R's. As was said in *Mackinder* v. *OSCA Develop-*

*ment Co.* (1984) 151 Cal.App.3d 728, 738 [198 Cal.Rptr. 864] "[P]rovision for attorney fees in a declaration of restrictions constituting a binding equitable servitude is a 'contract' within the meaning of Civil Code section 1717." Contrary to defendant's assertion, HLAC did not elect to seek attorney's fees as damages. (See *Herzog* v. *Riel* (1979) 99 Cal.App.3d Supp. 12 [160 Cal.Rptr. 510].) HLAC presented no proof of attorney's fees at trial, but rather submitted its claim as costs after the judgment was entered.

Finally defendants contend the trial court should have apportioned responsibility for the attorney's fees awarded as costs between the two sets of defendants. The Ross defendants do not object to this suggestion.

The judgment is modified to provide that the attorney's fees awarded as costs to HLAC shall be apportioned equally between the Ross defendants and the Shermoen defendants. As modified, the judgment is affirmed.

Parslow, J.,* concurred.

**CROSBY, J.,** Concurring and Dissenting.—This case has been reduced by the passage of time to the following, hardly earth-shattering issue: Shall a now 24-year-old man be allowed to reside in a 1,236-unit condominium development with his great-grandmother? I would answer in the affirmative based on Civil Code section 51.3, subdivision (g), which provides in part, "Any person who has the right to reside in, occupy, or use . . . housing . . . subject to this section on January 1, 1985, shall not be deprived of the right to continue that residency, occupancy, or use as the result of the enactment of this section."

On January 1, 1985, the purported age limitation for this development was 40. That was in clear violation of the Unruh Civil Rights Act on that date. (*Park Redlands Covenant Control Committee* v. *Simon* (1986) 181 Cal.App.3d 87, 94 [226 Cal.Rptr. 199].) Accordingly, whatever amenities the complex offered seniors at that time, it was not senior citizen housing on the operative date of Civil Code section 51.3; it was housing of the sort condemned in *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 742-743 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], i.e., so-called "adults only" condominiums calculated to exclude families. Consequently, this development had no lawful age restriction as of January 1, 1985.

The enactment of Civil Code section 51.3 has *now* legitimized Huntington Landmark as housing for seniors, but only by raising the age restriction

---

* Assigned by the Chairperson of the Judicial Council.

to 55. The 24-year-old man involved here does not meet that requirement, but under subdivision (g) he is a "grandfather" nonetheless (in company with all "adults only" occupants still younger than 55 years).

I would reverse with respect to Shermoen defendants. The Ross matter is moot except for the declaratory relief and attorneys fees issues, and I would also reverse as to them for the reasons stated above.

A petition for a rehearing was denied September 28, 1989, and appellants' petition for review by the Supreme Court was denied November 21, 1989.